Stephanie R. Tatar (237792)
**TATAR LAW FIRM, APC**
3500 West Olive Avenue, Suite 300
Burbank, CA 91505
Telephone: (323) 744-1146
Facsimile: (888) 778-5695
*Stephanie@TheTatarLawFirm.com*

James A. Francis
David A. Searles
**FRANCIS & MAILMAN, P.C.**
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
Tel. (215) 735-8600
*jfrancis@consumerlawfirm.com*
*dsearles@consumerlawfirm.com*

Attorneys for Plaintiff,
**BERENICE ARMAS-LOPEZ, individually
and on behalf of a class of similarly
situated persons**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERENICE ARMAS-LOPEZ, individually and on behalf of a class similarly situated persons, <br><br> Plaintiff(s) <br><br> v. <br><br> SKIPSMASHER, INC. <br> Defendant | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

No: 5:14-CV-01885-MWF (KLSx)

**PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Date:  November 9, 2015
Time:  10:00 a.m.
Place:  Courtroom 1600
Hon. Michael W. Fitzgerald

# **TABLE OF CONTENTS**

I.    **INTRODUCTION** ..................................................................1

II.   **STATEMENT OF FACTS** ................................................2

     A.    A Debt Collection Law Firm Garnished Plaintiff's Wages
           Based on Inaccurate Information in a Background Report
           Sold by Defendant.................................................................3

     B.    First Garnishment by DBA ...................................................4

     C.    Second Garnishment by DBA................................................5

     D.    Defendant's Deliberate Refusal to Comply With the FCRA.............6

III.  **LEGAL STANDARD** ..........................................................7

IV.  **ARGUMENT** .......................................................................8

     A.    Defendant is a CRA That Sells Consumer Reports ..............8

           1.    The Fair Credit Reporting Act ..................................8

           2.    The Skipsmasher Report is a Consumer Report .......10

                 a)    Defendant knowingly sold a report on Plaintiff
                      for collection purposes......................................10

                 b)    Skipsmasher knew and expected that its reports would be
                      used for FCRA purposes....................................12

                 c)    Skipsmasher's form Agreement contemplates
                      use of its data for FCRA purposes.....................16

                   d)    Skipsmasher obtained its data from
                      admitted FCRA sources.....................................17

     B.    Defendant Is Not Shielded From Liability By
           The Communications Decency Act ...................................21

IV.  **CONCLUSION**.................................................................23

PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

1

## <u>TABLE OF AUTHORITIES</u>

2

**CASES**

3
*Adams v. LexisNexis Risk & Information Analytics Group, Inc*.,
4
    2010 WL 1931135 (D.N.J. May 12, 2010) .................................................1, 12

5
*Bakker v. McKinnon*,
6
    152 F.3d 1007 (8th Cir. 1998) ..................................................................10, 11

7
*Batzel v. Smith,*
    333 F.3d 1018 (9th Cir. 2003) ........................................................................21

8
*Celotex Corp. v. Catrett*,
9
    477 U.S. 317 (1986) .........................................................................................7

10
*Comeaux v. Brown & Williamson Tobacco Co.,*
    915 F.2d 1264 (9th Cir. 1990) ......................................................................11

11
*Cortez v. Trans Union, LLC*,
12
    617 F.3d 688 (3d. Cir. 2010) .........................................................................10

13
*Cotto v. Jenney*,
    721 F. Supp. 5 (D. Mass. 1989)....................................................................16

14
*Galen v. County of Los Angeles*,
15
    477 F.3d 652 (9th Cir. 2007) ..........................................................................7

16
*Gelman v. State Farm Mut. Auto. Ins. Co*.,
17
    583 F.3d 187 (3d Cir. 2009) ............................................................................8

18
*Hasbun v. County of Los Angeles,*
    323 F.3d 801 (9th Cir. 2003) ........................................................................12

19
*Heath v. Credit Bureau of Sheridan, Inc.,*
20
    618 F.2d 693 (10th Cir. 1980) ......................................................................11

21
*In re Filiquarian Publishing, L.L.C.,*
    Docket No. C-4401 (FTC April 30, 2013) ...................................................19

22
*Ippolito v. WNS, Inc*.,
23
    864 F.2d 440 (7th Cir. 1988) ..................................................................10, 11

24
*Jarzyna v. Home Props., L.P.,*
25
    763 F. Supp. 2d 742 (E.D. Pa. 2011)............................................................16

26
*Leslie v. Grupo ICA*,
    198 F.3d 1152 (9th Cir. 1999) ........................................................................7

27

*Liberi v. Taitz*,
 No. 11-485, 2012 WL 10919115 (C.D. Cal. May 22, 2012) .........................20

*Manuel v. Wells Fargo Bank*,
 2015 WL 4994538 (E.D. Va. Aug. 19, 2015) ................................................21

*Moore v. Rite Aid Hdqtrs Corp.*,
 2015 WL 3444227 (E.D. Pa. May 29, 2015) ................................................16

*Phillips v. Grendahl*,
 312 F.3d 357 (8th Cir. 2002) ........................................................................11

*Pintos v. Pacific Creditors Ass'n*,
 565 F.3d 1106 (9th Cir. 2009) ......................................................................12

*Robins v. Spokeo*,
 2011 WL 1793334 (C.D. Ca. May 11, 2011)................................................23

*Robinson v. TSYS Total Debt Mgmt., Inc.*,
 447 F. Supp. 2d 502 (D. Md. 2006) ..............................................................12

*Safeco Ins. Co. of Am. v. Burr*,
 551 U.S. 47 (2007) ...........................................................................8, 11, 21

*St. Paul Guardian Ins. Co. v. Johnson*,
 884 F.2d 881 (5th Cir. 1989) ................................................................10, 11

*Yang v. Gov't Employees Ins. Co.*,
 146 F.3d 1320 (11th Cir. 1998) ..............................................................9, 11

**STATUTES**

15 U.S.C. § 1681(a)(4)..................................................................................8

15 U.S.C. § 1681a(b) ....................................................................................9

15 U.S.C. § 1681a(d)(1).......................................................................9, 10, 11

15 U.S.C. § 1681a(f)..................................................................................8, 9

15 U.S.C. § 1681b(a)(3)................................................................................9

15 U.S.C. § 1681b(a)(3)(D)...........................................................................9

15 U.S.C. § 1681e(a) ..................................................................................20

15 U.S.C. § 1681e(b) .........................................................................3, 6, 19, 21

15 U.S.C. § 1681g........................................................................................2, 20

15 U.S.C. § 1681i................................................................................2, 21

15 U.S.C. § 1681j................................................................................3, 21

47 U.S.C. § 230(c) ..................................................................................22

47 U.S.C. § 230(f)(2) ..............................................................................22

47 U.S.C. § 230(f)(3). .............................................................................22

**RULES**

Fed. R. Civ. P. 30(b)(6) ..........................................................................12

Fed. R. Civ. P. 56(c)(2)............................................................................7

PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

Plaintiff Berenice Armas-Lopez, by counsel, hereby opposes Defendant Skipsmasher, Inc.'s Motion for Summary Judgment (Doc. 40).

## I.    INTRODUCTION

This is a consumer class action based upon Defendant's willful violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA").  Plaintiff brings this action on behalf of consumers in the State of California and throughout the country.

Skipsmasher sold a grossly inaccurate report concerning Ms. Armas-Lopez to a collection law firm, with the result that Plaintiff became the victim of an unwarranted collection lawsuit and had her wages garnished for a debt she did not owe.

Defendant regularly sells reports to the debt collection industry and others that provide substantial, detailed personal information about individual consumers.  Defendant sells these reports for the purpose of assisting debt collectors with the collection of delinquent credit obligations, the location of assets, and the determination of whether a debt is eligible and/or appropriate for collection.  Defendant furnishes these reports without any legally permissible purpose for doing so and without the certification of a lawful purpose required by the FCRA.  As discussed in more detail below, Skipsmasher knowingly and intentionally refuses to comply with the FCRA without even the benefit of regulatory guidance or legal advice.

Given the Defendant's regular sale of these reports, the purpose for which they are sold, and the purpose for which the information contained in them is originally collected, Defendant is squarely regulated by the FCRA as a consumer reporting agency ("CRA").  *Adams v. LexisNexis Risk & Information Analytics Group, Inc.*, 2010 WL 1931135 (D.N.J. May 12, 2010) (report prepared to assist

PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

in collection of delinquent credit accounts was a consumer report within meaning of the FCRA).

On August 31, 2015, Defendant filed a Motion for Summary Judgment, Doc. 40 ("Motion"), in which it contends it is not covered by the FCRA.  But, as set forth in Plaintiff's Opposition to Defendant's Motion for Summary Judgment Pursuant to Rule 56(d), Doc. 43, Defendant moved for summary judgment while at the same time refusing to respond to written discovery and deposition questioning on issues that go to the heart of Plaintiff's claims and are central to Defendant's Motion.  Following a pre-motion conference with Magistrate Judge Stevenson, Defendant agreed to respond to the discovery, and did so on September 30, 2015.

The parties then agreed to and submitted a Stipulation to Modify Scheduling Order Regarding Certain Deadlines on October 7, 2015 (Doc. 55) that was approved by the Court by Order filed October 13, 2015 (Doc. 57).  Pursuant to that Order, at paragraph 1, Plaintiff files the within supplemental opposition to the Motion.

## II.   <u>STATEMENT OF FACTS</u>

Plaintiff has advanced five distinct FCRA claims in this case:

Count One, violation of section 1681e(a) by furnishing consumer reports to users who had no permissible purpose for using them and for whom Defendant failed to obtain the FCRA Only Use Certification;

Count Two, violation of section 1681g by refusing to clearly and accurately disclose all information in a consumer's file at the time of the consumer's request;

Count Three, violation of section 1681i by refusing to provide consumers with the opportunity to dispute the completeness or accuracy of information contained in a consumer's file at Defendant, by failing to reinvestigate disputes to determine whether the disputed

information is inaccurate, and by failing to provide notice of the dispute to furnishers of the information in dispute;

Count Four, violation of section 1681j by refusing to provide consumers with a free annual disclosure of all the information contained in their consumer file maintained by Defendant; and,

Count Five, violation of section 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff that Defendant reported to a debt collection law firm.

Complaint, Doc. 1.  Plaintiff's claims are based upon the facts set forth below.

## A.      A Debt Collection Law Firm Garnished Plaintiff's Wages Based on Inaccurate Information in a Background Report Sold by Defendant

Because Skipsmasher sold a recklessly inaccurate background report to a third-party collection law firm, Ms. Armas-Lopez became subject to unwarranted debt collection efforts and had her wages garnished on two separate occasions for a debt she did not owe.

On April 29, 2010, a Helen Burelli, represented by attorney Dennis P. Block of Dennis P. Block and Associates ("DBA"), a debt collection law firm located in Valley Village, California, obtained a default judgment for unpaid rent in the Superior Court of California for the County of Los Angeles – Long Beach, against a "Bernice Rodriguez aka Berenice Rodriguez."  While Plaintiff Berenice Armas-Lopez was formerly known as Berenice Rodriguez Armas, she has never used the names "Bernice Rodriguez" or "Berenice Rodriguez."  *See* Exhibit 1, Plaintiff's Dep. at 70:3-21.[1]

---

[1]      References to Exhibits herein refer to those exhibits attached to the accompanying Declaration of James A. Francis contemporaneously filed and incorporated herein.

PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

The rent judgment pertained to a lease for an apartment in Harbor City, California of which Helen Burelli is the owner. However, Plaintiff has never leased an apartment from Ms. Burelli, and has never lived in Harbor City, California. During the time that Ms. Burelli and her attorney alleged that the renter resided at the Harbor City address, Plaintiff resided in Anaheim, California. Moreover, the Social Security Number on the rental application at issue is not Plaintiff's Social Security Number. Complaint, Dkt. No. 1 at ¶¶ 27-28.

Plaintiff never owed a debt to Helen Burelli, nor has she ever been in a creditor-debtor relationship with her or DBA. In addition, Plaintiff never had an account with Burelli or DBA. *Id. at ¶ 29.* Accordingly, Skipsmasher never had any permissible purpose for selling any information about Plaintiff to DBA, Burelli or anyone else.

Plaintiff served in the military from 1995 to 2003. She left the military with the rank of sergeant. She obtained a master's degree in science and marriage and family therapy from the University of Southern California in 2010, and obtained employment with the County of Orange Social Services Agency, where she currently works today as a senior social worker. Exhibit 1, Plaintiff's Dep. at 13:1-19, 14:6-9.

## B.   First Garnishment by DBA

In December 2011, Plaintiff learned that her wages were being garnished by DBA pursuant to the aforementioned judgment against "Bernice Rodriguez aka Berenice Rodriguez" that DBA obtained for Ms. Burelli. Upon learning of the garnishment, Plaintiff advised Attorney Block's office that she was not the person who owed the debt and provided proof supporting her contention. Plaintiff notified Mr. Block's office that she had been the victim of identity theft and provided a copy

PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

of the Identity Theft Police Report she filed with the Anaheim Police Department in 2008, Police Report No. 08-153078.  Exhibit 2, Identity Theft Police Report.

In addition, Plaintiff's lawyer notified Mr. Block's office that he was garnishing the wages of an individual who was not the judgment debtor, and supplied Mr. Block's office with written proof.  Block terminated the garnishment on or about January 13, 2012.

**C.** **Second Garnishment by DBA**

Two years later, on or about March 5, 2014, Mr. Block once again began to garnish Plaintiff's wages based on the rent judgment he had obtained for Helen Burelli in 2010.  Again, Mr. Block was notified that Plaintiff was not the judgment debtor.  Mr. Block refused to stop the garnishment.

At a May 2014 state court hearing on Plaintiff's efforts to stop the garnishment, Mr. Block advised Plaintiff's lawyer that the Skipsmasher information was what his office had relied upon to continue the garnishment proceedings against Plaintiff, and provided Plaintiff with a copy of a report he had just obtained, dated May 5, 2014, to prove his point.  Exhibit 3, Skipsmasher Report.  The Skipsmasher report to Block dated May 5, 2014 misrepresented that it concerned the Plaintiff. *Id.*  It contained many inaccuracies, including misidentifying her by name and address. *Id.*

Notwithstanding Attorney Block's attempt to rely on the information he had obtained from Skipsmasher, the court heard evidence from Ms. Armas-Lopez, and dismissed DBA's garnishment proceeding.

In a subsequent case that Ms. Armas-Lopez brought against DBA for the wrongful garnishment, a lawyer for Mr. Block's office, Brandon Block, Esq., testified at a deposition that DBA had been obtaining information or reports on the Plaintiff from Skipsmasher since 2010 or 2012, and that the Skipsmasher reports were part of the reason that DBA attorneys maintained they were garnishing the

correct person's wages to satisfy the judgment they had obtained against a Bernice Rodriguez.    Exhibit  4,  Plaintiff's  Second  Supplemental  Responses  to Interrogatories.

As a result of Block's garnishment, based on the inaccurate Skipsmasher reports,  and  Skipsmasher's  refusal  to  allow  Plaintiff  to  correct  Defendant's inaccurate reporting, Plaintiff was  deprived of income for  several months, necessitating the use of interest-bearing credit cards and incurring of debt for her family's monthly expenses, and causing stress within her marriage.  In addition, she was embarrassed, humiliated by the possibility of her co-worker's knowledge of the situation, and otherwise suffered emotional distress, panic attacks, sleeplessness, anxiety  leading  to  overeating,  and  aggravation  of  hypertension.    Exhibit  1, Plaintiff's Dep. at 82:2-23, 83:1-9, 84:2-9, 84:15-24.

Plaintiff sent a certified letter to Defendant requesting that she be provided with a copy of her full consumer file.  Exhibit 1, Plaintiff's Dep. at 77:13-20; Exhibit 6, Armas-Lopez 5-6.  The return receipt for the letter shows that Defendant received the letter on June 2, 2014.  Exhibit 6.  Defendant never responded to Plaintiff's request in any manner and never provided Plaintiff with her full consumer file.  Exhibit 1 at 79:19-25.  Because of Defendant's policy about not accepting disputes or allowing corrections, along with its failure to abide by FCRA's accuracy requirement in section 1681e(b), Plaintiff is left without means to have Defendant cease reporting inaccurate information about her.

## D.    Defendant's Deliberate Refusal to Comply With the FCRA

At no time did Skipsmasher have any permissible purpose for selling information about the Plaintiff to DBA, and never obtained the FCRA Only Use Certification required by the FCRA.  To the contrary, Defendant sold Plaintiff's information to DBA upon the representation that it would be used for a non-

permitted FCRA purpose.  Exhibit 3, Armas-Lopez 1 – 4, Skipsmasher Report, p. 4;  Exhibit 5, Defendant's Supplemental Responses to Interrogatories, Nos. 21-22.

As is apparent from earlier filings in this case, Skipsmasher persistently refused to answer interrogatories, produce documents or answer deposition questions concerning certain details of its operations.  However, following a pre-motion conference with Magistrate Judge Stevenson, Skipsmasher answered an interrogatory and produced documents that revealed the sources from which Skipsmasher obtains the data on its background reports.  Exhibit 7, Defendant's Second Supplemental Response to Interrogatory 14; Exhibits 8-9, SKIP 106-130.[2] That additional information further confirms that Skipsmasher produces consumer reports and is a CRA within the meaning of the FCRA.

## III.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c)(2), a motion for summary judgment will only be granted if:  "The pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2) (revised as of Dec. 1, 2009).  A court may not, at the summary judgment stage, weigh evidence or make credibility decisions.  These tasks are left to the fact-finder.  *See generally Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 321–23 (1986)).

At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).  If evidence produced by the parties is conflicting, the judge

---

[2]    These Exhibits, designated by Skipsmasher as confidential, are the subject of Defendant's application that they be filed under seal.

PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

must assume the truth of the nonmoving party's evidence with respect to that fact. *Id.*

In the case at bar, there exist genuine issues of material fact and Defendant is not entitled to judgment as a matter of law.  Summary judgment, therefore, is inappropriate.

## IV.   ARGUMENT

### A.   Defendant Is A CRA That Sells Consumer Reports

Defendant's Motion is premised on its position that it is not a CRA and therefore is not governed in any respect by the FCRA.  Defendant is wrong.  The FCRA has always regulated the sale of consumer information that is collected and/or used for debt collection as well as employment and tenant screening.

#### 1.   The Fair Credit Reporting Act

"Congress enacted the FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 191 (3d Cir. 2009) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007)).  Specifically, Congress found that "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy."  15 U.S.C. § 1681(a)(4).

Pursuant to section 1681a(f) of the FCRA, the term "consumer reporting agency" means

> any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages ***in whole or in part*** in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f) (emphasis supplied).  "Person" is broadly defined under the Act as "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." 15 U.S.C. § 1681a(b).  "Consumer" is defined simply as "an individual." *Id*. at § 1681a(c).  There is no question that Skipsmasher is a "person" or that Plaintiff is "an individual."

A "consumer report" is defined to mean:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is ***used or expected to be used or collected in whole or in part*** for the purpose of serving as a factor in establishing the consumer's eligibility for—
> (A) credit or insurance to be used primarily for personal, family, or household purposes;
> (B) employment purposes; or
> (C) ***any other purpose authorized under section 1681b of this title.***

15 U.S.C. § 1681a(d)(1) (emphasis added).

Section 1681a(d)(1)(C) is the relevant provision here. By its plain terms, section 1681a(d)(1)(C) directs the application of section 1681b. "[S]ection 1681b has two functions: it ***adds*** to section 1681a(d)'s definition of a consumer report, as well as ***delineates*** the permissible uses for those 'communications of information' already falling within the definition of a consumer report." *Yang v. Gov't Employees Ins. Co.,* 146 F.3d 1320, 1324 (11th Cir. 1998) (emphasis added). Section 1681b reiterates, in a somewhat different fashion, the permissible purposes for credit, employment and insurance and also lists several other permissible purposes, which therefore become incorporated into the definition of consumer report.  15 U.S.C. § 1681b(a)(3).  "Collection of an account" is one of those purposes. 15 U.S.C. § 1681b(a)(3)(D).

PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

If information is originally collected for a purpose covered by the FCRA, a report containing that information is a consumer report, even if the report is later used for a transaction not covered by the FCRA. *Bakker v. McKinnon*, 152 F.3d 1007 (8th Cir. 1998); *St. Paul Guardian Ins. Co. v. Johnson*, 884 F.2d 881 (5th Cir. 1989); *Ippolito v. WNS, Inc*., 864 F.2d 440 (7th Cir. 1988). Thus, a CRA may have many purposes when it collects information, but if one of the purposes involves a purpose covered by the FCRA, the information becomes a consumer report. *See Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d. Cir. 2010) (rejecting claim that information Treasury Department terrorist watchlist was collected and provided only for USA Patriot Act purposes when it was requested and used in connection with credit decision.)

### 2. <u>The Skipsmasher Report is a Consumer Report</u>

The reports that Skipsmasher sold to the debt collection law firm concerning Ms. Armas-Lopez over a five year period, an example of which is attached as Exhibit 3,[3] clearly bore upon Plaintiff's "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living." 15 U.S.C. § 1681a(d)(1). Skipsmasher reported (incorrectly, as it turned out) names, history of addresses, date of birth, social security number, various cell and landline telephone numbers, email addresses and Streetview images, all of which it represented as belonging to Plaintiff, and which resulted in DBA garnishing her wages on two separate occasions.

#### a) **Defendant knowingly sold a report on Plaintiff for <u>collection purposes</u>**

---

[3]     The May 5, 2014 report attached as Exhibit 3 is, according to its first page, the "LAST REPORT." The "FIRST REPORT" was dated "06/19/2010." By its own admission, Skipsmasher has been selling background reports on Ms. Armas-Lopez for almost five years. Exhibit 3.

PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

The report that Skipsmasher compiled on Plaintiff, Exhibit 3, states at the top left: "PERMISSIBLE PURPOSE: Collections."  Skipsmasher's admission that it knew that "collections" was the purpose is consistent with DBA's express request to use the Skipsmasher report for "Collections."  See Application and Service Agreement signed by Attorney Block, checking off "Collections" as the intended use of the data, Exhibit 10 at SKIP 0095.

This evidence further satisfies the definition of a consumer report: that the consumer information be used or expected to be used for the purpose of serving as a factor in establishing the consumer's eligibility for credit, insurance, employment purposes or any of the permissible purposes listed in section 1681b.  *See* 15 U.S.C. § 1681a(d)(1).  Courts consider both the "purpose" for which the information contained in the report was "used or expected to be used or collected," as well as how a third party actually used the information, when determining whether a document qualifies as a consumer report under the Act. 15 U.S.C. § 1681a(d)(1). *See Phillips v. Grendahl,* 312 F.3d 357, 366 (8th Cir. 2002), *abrogated on other grounds by Safeco Ins. Co. of Am.,* 551 U.S. 47 (2007) (finding a consumer report existed where agency created the report with the expectation that it be used for a purpose permitted under the FCRA).  *Accord Bakker v. McKinnon,* 152 F.3d 1007, 1012 (8th Cir. 1998); *Yang,* 146 F.3d at 1324 (directing courts to consider a report's ultimate use, expected use and reason for the collection of information); *Comeaux v. Brown & Williamson Tobacco Co.,* 915 F.2d 1264, 1273–74 (9th Cir. 1990); *St. Paul Guardian Ins. Co. v. Johnson,* 884 F.2d 881, 884 (5th Cir. 1989); *Ippolito v. WNS, Inc.,* 864 F.2d 440, 450 (7th Cir.1988), *cert. dismissed,*490 U.S. 1061 (1989); *Heath v. Credit Bureau of Sheridan, Inc.,* 618 F.2d 693, 696 (10th Cir. 1980).

The facts of this case make clear that DBA, the collection firm, used the Skipsmasher report for the purpose of assisting in the collection of a debt.  That is undeniably a permissible purpose for obtaining a consumer report under the Act.

*Adams*, 2010 WL 1931135, *8; *Robinson v. TSYS Total Debt Mgmt., Inc.,* 447 F. Supp. 2d 502, 512 (D. Md. 2006) ("collection is a permissible purpose for **obtaining** a consumer report under the FCRA") (emphasis added). *See also Hasbun v. County of Los Angeles,* 323 F.3d 801, 803 (9th Cir. 2003), superseded by statute and declined to be extended by *Pintos v. Pacific Creditors Ass'n,* 565 F.3d 1106 (9th Cir. 2009) ("Collection of an account is nowhere defined in the statute, and the legislative history is not enlightening. But the limited case law addressing this issue has uniformly held that creditors have a permissible purpose in receiving a consumer report to assist them in collecting a debt.").

### b)    Skipsmasher knew and expected that  its reports would be used for FCRA purposes

Skipsmasher itself cannot deny, and has indeed admitted, that it expected the reports that it sold to be used for FCRA purposes such as collections, employment and tenant screening.  Moreover, Defendant sells hallmark FCRA information such as bankruptcies, tax liens and judgments.  Purchasers included collection law firms and prospective employers.

Robert Scott, Defendant's corporate designee under Rule 30(b)(6), testified that Defendant sells public record information to the debt collection industry:

> Q Okay. Am I correct that Skip Smasher does sell
> 3 ***bankruptcy-related information*** to its customers?
> 4 A We have bankruptcy index information.

Exhibit 11, Scott Dep. 32:1-4 (emphasis added).

> Q I see. Okay.
> 5 The ***bankruptcy index data*** that Skip Smasher
> 6 sells -- does that -- do you also get that from the data
> 7 aggregator?
> 8 A We have a couple different sources of that.
> 9 They're both data aggregators.

*Id*. 33:4-9 (emphasis added).

Q Anybody else other than those two entities?
10 A Oh. Yes. Yes. We have our permissible
11 business type list. It's posted on the website, but off
12 the top of my head, private investigators are like the
13 lion's share of our customers, and then we have got some
14 repo agencies, and then we have a very, very small group
15 of others that would include ***collection law firms***.
16 We've got some ***collection agencies***, financial
17 institutions.
18 Q Okay.
19 A And we no longer take business from bail bond
20 agencies, but we've got some that were grandfathered in.
21 Q All right. Okay. So your website -- on one of
22 the pages of your website it references that your
23 customers are licensed P.I.s, repo agencies, registered
24 process servers, ***collection law firms***, and financial
25 institutions. Is that an accurate description of the
1 various markets that you sell your products to?
2 A Yes.

*Id*. 36:9-25; 37:1-2 (emphasis added).

Q Right. I know they did that here. My question
16 is in general. If a customer selects ***collections*** as the
17 purpose, you will sell them a report; correct?
18 A Yes.
19 Q All right. Is there anything atypical or
20 unusual about the format or the layout or the content of
21 the information which is set forth in Scott 2, or is
22 this a good example of what a typical mega people search
23 would look like?
24 A This is typical.

*Id*. 47:15-24 (emphasis added).

Q Now, in terms of the ***bankruptcies, tax liens,***
10 ***and judgments report***, do you get that information from
11 the same data aggregator that you discussed earlier that

12 you don't believe you can disclose pursuant to the
13 nondisclosure agreement?
14 A Yes.

*Id*. 50:9-14 (emphasis added).

Q Okay. Do you recognize Scott 3?
3 A I do.
4 Q Can you identify it for the record, please.
5 A Yes. It is the Skip Smasher application in
6 terms of service.
7 Q Okay. And what do you use this document for?
8 A This would need to be completed by an applicant
9 for Skip Smasher.
10 Q All right. If you look at the second page of
11 Scott 3, there is a heading at the bottom that begins
12 "data." Do you see that?
13 A Yes.
14 Q And in connection with the customer's
15 application to become a customer of Skip Smasher, you
16 ask them to check off one or more of these boxes to
17 indicate the purposes for which they will use this data;
18 correct?
19 A Yes. Yes.

*Id*. 52:2-19.   Mr. Scott also testified that Defendant expected and allowed Skipsmasher to be sold and used for pre-employment screening:

6 Q Okay. So if a customer applied to Skip Smasher
7 using Scott 3 as its application and checked off the box
8 "***Employment screening*** (non-FCRA)" you would allow the
9 sale of Skip Smasher data for that purpose; correct?
10 A If all -- if all of their other credentials
11 checked out, yes.

*Id*. 57:6-11 (emphasis added).

12 Q Okay. Looking at the box above it, "***Employment***
13 ***screening***," can you tell me the instances in which you
14 allow employment -- you allow Skip Smasher data used in

15 connection with employment screening?
16 A Yes. I can.
17 Q What are -- what are the situations in which
18 you would allow it?
19 A If our customer is, for example, licensed
20 private investigation agency conducting a ***preemployment***
21 ***investigation***, they may use our data in connection with
22 creating their investigative consumer report as long as
23 none of our data is used for any FCRA-permissible
24 purposes.

*Id*. 58:12-24 (emphasis added).

8 Q So would you agree with me that the FCRA allows
9 the use of consumer information in connection with
10 ***employment screening***?
11 A Yes. As I understand your question, yes, of
12 course.

*Id*. 59:8-12 (emphasis added).

20 Q Sure. Why don't you give me an example when
21 you allow Skip Smasher information to be sold to
22 companies who are using it for ***employment screening***
23 purposes.
24 A Yes. In that scenario -- let's take a private
25 investigation agency -- they are conducting a

1 ***preemployment background investigation***. So in that
2 scenario they are the consumer reporting agency. They
3 are the CRA. They are creating the investigative
4 consumer report. Not Skip Smasher. Them. They are
5 taking on that onus by doing a ***preemployment background***
6 ***check***, which is an FCRA-regulated product because it's
7 an investigative consumer report.

*Id*. 59:20-25, 60:1-7 (emphasis added).

Although Mr. Scott attempted at times to backtrack from his admissions, it is clear from his testimony that he knew his company's reports were being used for the FCRA purposes of collection and employment screening.  At the very least, his testimony presents issues to be resolved by a jury.

Skipsmasher's knowledge of the FCRA use that its customers were intending for the reports is further bolstered by the form contracts it required its customers to sign, as discussed below.

### c)    Skipsmasher's form Agreement contemplates use of its data for FCRA purposes

Skipsmasher requires its customers to sign an Application and Service Agreement before it will provide them with any information.   Defendant's Statement of Facts, 3.  The Agreement signed by Attorney Block in this case, dated January 12, 2005, is attached hereto as Exhibit 10 (SKIP 0094-0105).   That document contains a series of reasons that the customer must check off indicating how it intends to use Skipsmasher data.  Exhibit 10, SKIP 0095-96.  The Block Agreement checked off the box labeled "Collections."  *Id*. at SKIP 0095.  Besides collections, the intended uses in Defendant's form Agreement include tenant screening, employment screening and employment verification.  *Id*.  All of these are FCRA purposes.  *See, e.g*., *Jarzyna v. Home Props., L.P.,* 763 F. Supp. 2d 742 (E.D. Pa. 2011) (tenant screening and debt collection organization that collected data from rental applications and combined it with information from other CRAs assembled and compiled consumer information and was a CRA); *Cotto v. Jenney*, 721 F. Supp. 5 (D. Mass. 1989) (potential risk of allowing applicant to occupy apartment relates to credit-worthiness); *Moore v. Rite Aid Hdqtrs Corp*., 2015 WL 3444227 (E.D. Pa. May 29, 2015) (sustaining claims that employment screening background reports violated FCRA).

Skipsmasher has admitted it sold the Plaintiff's report to DBA for collection purposes.  Exhibit 3.  While Defendant might deny that it performed tenant screening or employment screening/verification, or that it placed restrictions on such searches, the documentary evidence to the contrary, Exhibits 3 and 10, at a minimum creates a triable issue of fact whether Defendant sold consumer reports within the meaning of the FCRA.  By requiring its customers to designate their intended use of its data, Skipsmasher necessarily expected the reports it sold to be used for FCRA purposes.

### d)  <u>Skipsmasher obtained its data from admitted FCRA sources</u>

Mr. Scott testified that he was aware that at least one of his vendors sold FCRA products:

> 1 Q Okay. Is one -- in the -- in some of the
> 2 materials that your counsel disclosed in this
> 3 litigation, there was e-mail correspondence between you
> 4 and somebody at a company called Microbilt,
> 5 M-i-c-r-o-b-i-l-t. Do you know of a company Microbilt?
> 6 A I do.
> 7 Q Is that one of the vendors that you use?
> 8 A Yes.
> 9 Q Okay.
> 10 A Oh, you know what? You are correct. Microbilt
> 11 -- I believe they do have -- sell FCRA products. Yes,
> 12 they do. My bad. We have a number of vendors. I just
> 13 didn't think of them. Yes, Microbilt does sell FCRA
> 14 products.

Exhibit 11, Scott Dep. 73:1-14.

The Block Agreement, Exhibit 10, provides additional proof that Defendant was obtaining FCRA data from its vendors.  Mr. Scott testified that the Block Agreement was created by one of its vendors who required Defendant to use it. Exhibit 11, 54:10-17.  As two of the delineated purposes of the Block Agreement

included tenant screening and employment, it is clear that the sources of Skipsmasher reports collected and disseminated consumer data expected to be used in connection with FCRA purposes.

Further, the discovery that Skipsmasher belatedly produced after the conference with Magistrate Judge Stevenson, and designated as confidential, unequivocally demonstrates that Skipsmasher obtained its data from admitted FCRA sources. In its supplemental answer to Interrogatory 14, Defendant stated:



Exhibit 7 (filed under seal).

Defendant also produced the contracts it entered into with the sources. *See* Exhibits 8 and 9 (filed under seal). The source contracts provide further evidence that the Skipsmasher reports were done for FCRA purposes. ███████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████ Exhibit 8 at SKIP 0121. ██████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████. Exhibit 9, SKIP 0125-26.

PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

Whatever Skipsmasher's intention was, and it will likely protest that it did not intend its reports to be considered consumer reports,[4] the facts show that it knew the information it was providing was for a FCRA purpose and that the report was derived from admitted FCRA sources.  Despite that knowledge, it willfully persists with the notion that it does not have to comply with the FCRA:

> 8 Q So I understand -- so I understand that to be
> 9 the position that the defendant has taken in this case;
> 10 so my question was simply you don't have any procedures
> 11 because you don't consider yourself regulated; correct?
> 12 A Correct.
> 13 Q All right.
> 14 A As I understand your question, correct. As I
> 15 understand your question, sir, correct.
> 16 Q Okay. So you don't -- the defendant doesn't
> 17 have any procedures in place to assure that it complies
> 18 with section 1681e(b) of the Fair Credit Reporting Act?
> 19 A I'm not familiar with that specific section off
> 20 of the top of my head; so I can't answer that.
> 21 Q Okay. Okay. Do you have any procedures at all
> 22 to provide consumers with free copies of the information
> 23 that you sell about them?
> 24 A No.

Exhibit 11, Scott Dep. 98:8-24.  Skipsmasher stubbornly maintains that position in the absence of any supporting regulatory guidance or legal advice whatsoever:

> Q Okay. Have you ever obtained any type of
> 18 guidance from the FTC or CFPB or any other regulatory

---

[4]    Defendant's self-serving disclaimer (or its so-called "good faith belief that it was not subject to the FCRA," *see* Exhibit 5) is insufficient to show that the reports it sells are not consumer reports.  *In re Filiquarian Publishing, L.L.C.,* Docket No. C-4401 (FTC April 30, 2013) (Final Decision and Order (companies that clearly promoted background reports, available through mobile applications, for use in employment screening, but included disclaimers purporting to state that reports should not be considered screening products for insurance, credit, or employment purposes, were not incompliance with FCRA).

PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

19 agencies that your company is not a credit reporting
20 agency as defined by the FCRA?
21 A No.
22 Q Have you sought any guidance or clarification
23 from any regulatory agency such as the FTC or CFPB as to
24 whether your company is a credit reporting agency as
25 defined by the FCRA?

1 A No.
2 Q Have you obtained any formal advice of counsel
3 prior to the litigation in this case which held that
4 Skip Smasher or advised you that Skip Smasher was not a
5 credit reporting agency as defined by the FCRA?
6 A No.

*Id*. 78:17-21; 79:1-6.

While Defendant will protest to the contrary,[5] a reasonable jury could easily find, based on this record, that the Defendant is a CRA that issues consumer reports and therefore is required to comply with the FCRA.  Skipsmasher could be found in violation of section 1681e(a) because it failed it obtain the FCRA Only Use Certification; in violation of section 1681g because it refused to clearly and

---

[5]     Defendant cites to *Liberi v. Taitz*, No. 11-485, 2012 WL 10919115 (C.D. Cal. May 22, 2012), asserting that disclaimer language on the defendant's website and in the relevant contracts demonstrated that the report at issue was not sold for an FCRA purpose.  Def. Mem. at pp 9-10 (citing *Liberi*, 2012 WL 10919115, at *6).   In *Liberi*, however, the court emphasized that its finding was limited to the facts with which it was presented, and "is not intended to serve as a blueprint for other litigation . . . ." 2012 WL 10919115, at *7.  Further, the *Liberi* court found that the defendant's showing could have been rebutted by a showing that despite the disclaimer language, the report was in fact obtained for an FCRA purpose, but that the contradictory allegations presented were insufficient.  *Id*. at *6.  Here, however, as demonstrated above, there is ample evidence demonstrating that the report Skipsmasher sold to DBA was sold for collection purposes.

1
2
3
4
5
6
7

accurately disclose all information in a consumer's file at the time of the consumer's request; in violation of section 1681i because it refused to allow consumers the opportunity to dispute inaccurate information in their files; in violation of section 1681j because it refuses to provide consumers with a free annual disclosure of their consumer files; and in violation of section 1681e(b) because it failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff that Defendant reported to Dennis P. Block and Associates.[6]

8
9

**B.     Defendant Is Not Shielded From Liability By The Communications Decency Act**

10
11

Skipsmasher seeks protection under the Communications Decency Act (CDA), a statute that has no applicability here.

12
13
14
15
16

Defendant cites no authority applying the CDA to causes of action under the FCRA.  This should not be surprising, given that the law was created primarily for protection of minors from being exposed to obscene materials on the internet. *Batzel v. Smith,* 333 F.3d 1018, 1026 (9th Cir. 2003).  The applicable sections of the CDA provide as follows:

17
18
19

(c) Protection for "Good Samaritan" blocking and screening of offensive material
(1) Treatment of publisher or speaker

20
21

---

22
23
24
25
26
27

[6]     Defendant's Motion does not raise any issue regarding whether its actions and failures to act were willful under the FCRA. See *Safeco Insurance Company of America v. Burr*, 551 U.S. 47, 57 (2007).  For that reason, Plaintiff does not address willfulness here.  Suffice it to say that the issue whether Defendant's interpretation of the FCRA was objectively reasonable is not appropriate for a summary judgment motion.  *See Manuel v. Wells Fargo Bank*, 2015 WL 4994538, *18 (E.D. Va. Aug. 19, 2015) (denying summary judgment; holding that willfulness is a question of fact for the jury).

> No provider or user of an interactive computer service[7] shall be treated as the publisher or speaker of any information provided by another information content provider.[8]

47 U.S.C. § 230(c).

Skipsmasher is not an interactive computer service or the type of online publisher contemplated by the CDA; it is not merely disseminating or republishing third party content such that if the CDA were somehow to pre-empt the FCRA and apply to its business model, Defendant would be immune from suit.  In fact, Skipsmasher, for a fee and under an agreement to terms and conditions, gathers information about a person based on personal identifying information input by a customer, in this case, Dennis P. Block and Associates.  UMF 2-4.  This is not a service available to the general public.  *Id*. at 2-3, 14.

Skipsmasher then taps into other sources to pull information from those third party sources, compiles the information, and then spits out a report that purports to show a slew of personal information about an individual for the purposes of collection.  *Id*. at 16.  Defendant is not a conduit; its service involves compiling and analyzing the information it gathers so that it can create and generate a report on a given individual.

---

[7]    The term "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

[8]    The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service. 47 U.S.C. § 230(f)(3).

Skipsmasher neglects to bring to the attention of this tribunal a case from this Court that is directly contrary to its argument. Another CRA's attempt to seek immunity under the CDA was rejected by this Court in *Robins v. Spokeo*, 2011 WL 1793334 (C.D. Ca. May 11, 2011), *cert. granted on other issues*, 135 S. Ct. 1892 (U.S. April 27, 2015) (no CDA immunity from FCRA claim where plaintiff alleged that, unlike information content providers that simply reorganize information obtained from other content providers, defendant developed original content based on information obtained from a variety of sources and posted it online).

Here, Skipsmasher, like the defendant in *Spokeo*, is not the simple interactive computer service it claims to be. The inaccurate and damaging report that it created about the Plaintiff was not simply republishing speech of others. The report was instead created for and based on Defendant's own investigation performed for its customers only, not the general public.

## V.   **CONCLUSION**

For all the reasons discussed above, Plaintiff Berenice Armas-Lopez respectfully requests that Defendant's Motion for Summary Judgment be denied.

Dated: October 19, 2015

Respectfully Submitted,

_____
Stephanie R. Tatar
Tatar Law Firm, APC
3500 West Olive Ave., Ste 300
Burbank, CA 91505
(323) 744-1146 Telephone
(888) 778-5695 Facsimile

PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

## **CERTIFICATE OF SERVICE**

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and not a party to the above-entitled cause.

On October 19, 2015, I electronically filed the preceding document(s) with the Clerk of the Court using the CM/ECF system, which sent electronic notification of such filing to all other parties appearing on the docket sheet;

STEPHEN H. TURNER, SB# 89627
E-Mail: Stephen.Turner@lewisbrisbois.com
PATRIK JOHANSSON, SB# 231769
E-Mail: Patrik.Johansson@lewisbrisbois.com
DAVID D. SAMANI, SB# 280179
E-Mail: David.Samani@lewisbrisbois.com
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
633 West 5th Street, Suite 4000
Los Angeles, California 90071
*Attorney for Defendant*
*Skipsmasher Inc.*

I declare under penalty of perjury that the above is true and correct, and that I am employed in or by the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 19, 2015, at Burbank, California.

_____
Stephanie R. Tatar

PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT